Good morning, Your Honors. Mike Ackerman for the Appellant, Mechanical Marketing, Inc. This is an appeal from an order granting summary judgment like the prior case. We contend in this case that there was evidence upon which our complaint is proper, and that the trial court in this case basically decided the credibility of the evidence in ruling on the motion for summary judgment. One of the issues that was brought up in the opposing brief was the supposed allegation that there was an amendment to the written contract in 1998 that is not alleged anywhere in either the complaint, the First Amendment complaint. The 1998 contract was limited to IBM sales, and it was at 5 percent, both in our First Amendment complaint and in the counterclaim. It is alleged that in 2005 there was a new oral agreement made. Counsel, I'm hoping you can help me here, but let me just tell you what my problem is. Let's assume for a minute that the trial judge was incorrect in concluding that there was no oral contract. Let's just assume that it is exactly as you pled it. Thereafter, I have problems, because even assuming the existence of the contract, I don't see a violation of the contract. What am I missing? We have the Flo sales, Your Honor, where my client's wife, who was the bookkeeper, we subpoenaed the records from Flo. She has her internal records, and it shows that they did not pay the amount of commissions, the 2 percent commissions, that were due on the Flo sales. Well, but again, I'm taking the contract as pled, and as I understand it, as pled, isn't there a serious question whether the Flo contract would be covered by that? They were not a party, were they? Flo is a customer. I understand that. So if my client procures a sale from Sixon to Flo, which occurred in this case, Sixon was the party who sold to Flo, my client gets paid a commission. It is a sales representative commission. So if a sale occurs between Sixon and Flo, we get a commission. That's because of the way you construe the oral contract, right? Both sides agree to that. There's no dispute that the oral agreement said, if Sixon sells to Flo or any other customer in the United States, you get paid a 2 percent commission, period. There's no – But were the – who manufactured the products that went to Flo? Flo was Sixon. Sixon sold – Not the Sixon group? Not the Sixon group. I thought one of the problems in the case is you're claiming commissions for sales that were made by other entities within the family of Sixon. That's the Sensato sale. That's a different sale. The Flo sale is directly from Sixon. We sent a subpoena to Flo's offices in, I believe, Washington. And what's the amount of commission that's due on that sale? Correct. There's $18,000 that was not paid. It's below the $75,000, but it's enough to avoid summary judgment. That is a direct sale by Sixon to one of our customers. No dispute that it's our customer. Where in the record can we find the total amount of commissions Sixon paid to MMI? I'm sorry, the total amount of commissions? Right. I don't believe that's anywhere in the record. What's in the record is the declaration from Carol Dolgen saying how much was not paid. And that's the wife, right? That's correct. And that's the only evidence? On the Flo, correct. The Flo, right. Correct. That's based upon the subpoena of the records from Flo, her review of the records that she received directly when you get a sale from the principal, in this case Sixon, they provide you a report of the sales. Right. So she compared the reports of sales and the commissions that were paid to the actual sales records that we received from Flo, and then said, okay, here's where the shortage  But does she say that in her everyday that these are the commissions from Flo that we were due? Yes. From Flo? Correct. Okay. Not well, Flo doesn't pay the commissions. Flo only buys the product. I'm sorry. Yes. I'm sorry. From Sixon. Yeah. Sixon. She said directly this was the amount of commissions that we should have been paid by Sixon and were not paid. The objection that was made Are we talking about paragraph 6 of her declaration? I don't. I'm looking at ER 230. Let me grab that if I can. Sure. Declaration of December 27, 2012. Carol, is it Dolgen? Is that how it's written? Dolgen. Okay. 230, you said? Yeah. 230. Okay. Correct, Your Honor. I personally reviewed all of the commission reports for Flo International Corporation for the years 2006 through 2009. I calculated the total amount of commissions earned on an annual basis. I also reviewed the reports produced by Flo International Corporation, showing the total amount of sales in each calendar year. Based upon my review of these records, MMI should have received an additional $10,542.65 in commissions for 2007 and $8,422.38 for 2008. MMI was shorted $18,965.03. And where is Mr. Lenz's declaration in the record? That's Lenz's, I think, or Lenz's? Lenz's. Right. That's under seal. Oh, that's right. Never mind. It is under seal. Right. What happened was we subpoenaed the records. They produced only the financial reports. I got his declaration to attach to the financial reports that they produced. And that's tab 13, docket number 132 is the order. And his declaration is a part of the sealed record. And do you have any other additional evidence to support Ms. Dolgen's affidavit regarding these flows, the commissions from CIXON regarding flow? I guess I'm just trying to figure out if you were required under our precedent to submit supporting documents. Well, in this case, we subpoenaed the record. We got the records from CIXON in terms of these are the actual reports of sales. We subpoenaed the records from flow. CIXON objected to the declaration from Mr. Lenz. So we requested leave of the court in opposition of the motion for summary judgment to take the deposition of Mr. Lenz if we needed to. The court never addressed that. So if it were required to get a more technical declaration or to get it under oath, we asked leave to do that because we did we sent a subpoena in good faith. We had no objection to the subpoena. We got the documents from the custodian of records. We got a declaration from the custodian of records. If for any reason that was not technically compliant, we asked leave of the court to take his deposition. The court never addressed that request. Is there anything in the declaration from the wife as to how a determination was made in the review of the records that enabled her to come out with the calculation on commissions? She's obviously a biased witness in this case, right? There's no question that she's a party to this case and she's the wife, but that goes to the credibility of her testimony, not to the weight of her testimony. Well, not necessarily because she's being engaged here, if you were, as maybe not an expert in the technical sense, but she's being asked to perform essentially an accounting function. Is the court required to credit her declaration? Yes, Your Honor. You're applying a 2 percent calculation. Right. To numbers that she received either from Flo or from Sixon's records. But does it say in the documents that she reviewed where everything went? In other words, is it really clear that it went from one entity to another entity that's covered under the alleged oral contract? It is Sixon who sends her the record saying, these are your commissions on sales to Flo, which is your customer. Right. We subpoena the records from Flo who say we sold more than they give numbers. They don't say we sold more, but they give numbers. So she simply compares the two numbers, the numbers she received from Sixon versus the numbers she received from Flo or we received from Flo and applied a 2 percent. So it's not, you don't need an expert to do math at 2 percent of a number. And from your perspective, that's all that was done here. There was no interpretation of anything else. Absolutely not. No, I mean it's, I get a report from Sixon and it says in this month you sold $10,000 worth of goods on our behalf to Flo. We get the same records from Flo saying, no, we bought $20,000 worth of goods. So she says, okay, if I take the difference of $10,000 and multiply it times 2 percent, I'm entitled to $2,000 or $200 in that instance. Sure. So it's not a requirement of an expert. Are there any other questions? Otherwise, I'd like to reserve for. Sure. Thank you very much. Your Honor, John Juice representing Sixon Precision Machinery Company, and with me is Jeffrey Wang of our firm. Let me first start by saying in this case the issues all revolve around these oral agreements and these declarations. Right? So the oral, let's talk about the oral agreement that's alleged. The only evidence of that oral agreement is a self-serving statement from the plaintiff in this case. Well, but this is a party. I mean, she's the witness. She was the bookkeeper. And according to the opposing counsel here, they got the, they subpoenaed records and then she made a determination. Are you saying, I'm just trying to figure out why doesn't that go to weight, not to admissibility? Well, that declaration is a declaration concerning damages to flow. Right? It's not the declaration concerning the oral agreement, which was authored. Sure. No. Yes. Okay. So let's address that. You were starting to talk about the oral amendment. I was starting to talk about the oral amendment. Judge McGill wants to talk about that. But let me address your question first, though. So let's talk about that flow declaration. What she actually says is she reviewed the commission reports for flow that flow produced and calculated the total amounts of commissions earned and reviewed the reports produced. So she says, I personally reviewed all the commission reports for flow international corporation. So we don't know what that is. What is that? Is that the documents that Sixon produced saying what they paid to MMI, or is that documents that flow produced saying what the sales were from flow to, I mean, from Sixon to flow? Well, I read her declaration in paragraph six as simply saying I looked at what Sixon paid us based on the sales that they attributed to flow. And then I compared the documents we got from flow that showed what their records revealed in terms of purchases. Right. And she doesn't total. Hear me out. Okay. And then she told lit and she applied 2% to it and presumably subtracted the difference between that number and whatever Sixon reported as the commissions that they paid. And she came up $18,000 short. Am I missing something? Yeah, I think we're missing one thing. I mean, I think what she did, a fair reading of her statement, is that she reviewed her historical commissions that were paid to her, right, by Sixon. And then she reviewed the sales reports that flow produced, right? And applied a 2% commission. Applied 2%. It doesn't say I applied 2%. It doesn't say what the totals were. It doesn't say the total for this was this number, the total for this was this number. I applied 2%. I agree. I'd be much happier if there were a schedule attached that listed by sales transaction the date, the amount of the sale, and then applying 2% to that amount, and then a total at the bottom of the Excel spreadsheet that equals $18,000. But why isn't it sufficient at the summary judgment stage for her to say what she said in paragraph 6? That creates a contested issue of material fact, does it not? Well, in this case, I mean, the judge discounted her testimony. And I think he's allowed to under Ninth Circuit precedent because the circuit recognizes grounds for exclusion of evidence. And I'll cite you two cases. There's some cases in the brief, but here's two additional ones. Federal Trade Commission v. Niovi, 604 F3rd 1150, 1159 Ninth Circuit, 2010, which held specific testimony about a single declarant can create a tribal issue of fact, but the district court was correct that it need not find a genuine issue of fact if, in its determination, the particular declaration was uncorroborated and self-serving. And that is followed up by another case, Villamaro, V-I-L-L-I-A-R-I-M-O v. Aloha Island Air, which essentially says the same thing, stating, oh, sorry, the site is 281 F3rd 1054, 1061 Ninth Circuit, 2002. 281 F3rd? 281 F3rd. And the? 1054. 1054. And then the pinned site is 1061. Okay. And it says, this court has refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony. And here that testimony is not corroborated. She doesn't cite the documents of record where these totals are, are not in evidence. They're not up record. They're not supplied anywhere. And we just don't know what she did with those numbers. We can assume that she applied the 2%, and I think that is basically attorney argument. Those two cases I just cited will also go to show that the alleged oral agreement, which was submitted in the declaration of Arnold Dalgans, that can be discounted by the district court. And if you look at the district court's opinion, he really doesn't address the Dalgans declaration at all. It could be that it was a fair reading of the opinion would say that he didn't admit that in evidence. And on appeal. Why wouldn't it be admissible? Well, we had objections to the admissibility based on hearsay. What are the grounds? And other things. He's the participant to the conversation. It's a statement by a party opponent, and therefore as admissible as against interest. What's your next objection? Overruled. Well, again, it falls under this line of cases where it's a safe, it's a self-serving declaration, and nothing is corroborated. Well, but counsel, hear me out. I mean, the concern I have is how else would you ever prove an oral agreement? You're not going to have any documents by definition because it's an oral contract. So if the participant, if the parties to the contract can't establish a foundation for the admissibility of the terms of the oral agreement, who can? Well, there needs to be some type of corroboration. Like a recording, a video? Something. The behavior of the parties, for example. And what's your best case for that? That's not the law. Well, let's assume you're right. With all due respect. I am right. Let's assume you're right. Last time I looked at the rules of evidence, I think I was right. So let's assume everything that the plaintiff says is correct, right? That there was this agreement that this big six-on global group exists, which is very little evidence of, and that they're entitled to commissions from any company in this global group to any of their customers. Let's assume that's all true for a moment and go to the issue of damages. There's three components to the damages alleged in this case. There's Flo, which we just discussed. There's Sensita, which I'll discuss in a minute. And then there's this third category, this other category, which is GE and Luck, which appears on pages 20 to 21 of our brief. The plaintiff did not appeal the third category, the other category, the GE Luck category. So the district court's ruling as to the other category, which is on page 7 of the district court's order, has to be affirmed. The district court said you did not provide any evidence of damages to this other category. And because that was not appealed, we believe that that holding should be upheld. And that's very important because a lot of discovery went to this other category. If anything happens, we don't want this coming back at us. Now, let's talk. You want to save at least that portion. Right, right. Now, Sensita, let's talk about Sensita. Even if the plaintiff is right that there's this agreement that any sale from this conglomerate, this global entity, should be commissioned to the plaintiff, even if it's not 6-0. That is Sensita. The plaintiff approached Sensita in 2004. Sensita was part of TI at the time and later got spun out from TI. They approached Sensita in 2004, and they tried to sell parts to it. And then they subpoenaed Sensita to see if Sensita had bought parts from this global group, and under their theory, they should get commissions. Sensita did not produce anything. They said, we have no documents. We did not buy anything from this global group. So the plaintiff didn't stop. The plaintiff said, well, who do you buy stuff from? And they said, we buy stuff from measurement specialties. So the plaintiff subpoenaed measurement specialties. Did you buy things from this global group, measurement specialties? They said, no. We never bought anything from a global group. The plaintiff went further. They subpoenaed measurement specialties. Did you buy anything from a company called CMAX? Measurement specialties said, yes, we bought a lot of stuff from CMAX. And now the plaintiff is saying, CMAX is part of this global group, and so the commissions that are due to us, not from sales that measurement specialties made, I mean, not from sales that the customer that they approached, CMAX, made with a global group member, are from a separate entity. The deposition of measurement specialties was taken. Measurement specialties had never heard of the plaintiff, had never heard of Mr. Dolgens. And most importantly, measurement specialties was buying things from CMAX as early as 2000, and that's in the record, pages 20, let's see, page 12 of our brief, and the argument's at pages 35 to 38 of our brief. So the plaintiff wants to get commissions from measurement specialties who had never approached. The plaintiff approached. It's all very confusing. The plaintiff approached. Well, I think what I— Right. Mr. Dues, let me just make sure I understand your argument here. I think what you're saying is the best evidence that plaintiff can show is the oral declaration, the declaration of the oral agreement. Right. And there isn't any corroborating evidence to establish the reasonableness of the terms that he is alleging that agreement contemplated because these documents that you tried to discover just don't exist or don't corroborate what he claims were the terms of the contract. And even if he claims—even if he's right on the terms of the contract, there's no damages as to this entity, as to the entity called Sensita. There's no damages to Sensita because plaintiff approached Sensita. Sensita never bought anything from anyone, not the global entity, not Csikszentmihalyi. Sensita is a customer of another company, measurement specialties, that did buy things from a company called CMAX. So what plaintiff wants is commissions from a third removed entity, measurement specialties, who had never approached and who had been buying things from CMAX four years before the plaintiff approached Sensita and TI. And even if you agree with the oral agreement, there is one element of the oral agreement in Arthur Dalgan's declaration, which is paragraph 6. He says the oral agreement covered commissions from this global group with the exception of house accounts, meaning the exception of accounts which already existed. And this Sensita issue revolves around measurement specialties buying before Arthur Dalgan's got involved. So measurement specialties buying from CMAX would have fell within this house account provision in the oral agreement. Thank you. Can I have you go back to the commissions with respect to flow? And I'm just trying to figure out if the invoices at ER 436 to 486 reflect the total amount of commissions that Csikszent paid to MMI for the flow purchases. I don't know. I don't know what those numbers come from. You don't know where the ER numbers come from? You don't know where those numbers reflected? Oh, yeah, the ER numbers. Those ER numbers, I think, are the just — Well, it looks like it's — they're invoices from ER 436 to 486. Okay. So ER 386 — No, 436 to 486. 436 to 486. And I guess it's under seal, but Mr. Lenz has submitted also some documents and receipts in summary. Did you get a chance to look at those? No, those were under seal, so — Oh, you didn't get a chance to look at those? We didn't get a chance to look at those. But don't you have a — doesn't Csikszent have a record for all the purchases flow made? Can't Csikszent verify any of this information? Right, and we don't know whether she looked at those records that Csikszent maintained, because that doesn't appear in her declaration. But to answer your question, yes, these do appear to be the invoices that were produced by — not by Csikszent, but by some other party, SPM. But I don't know that — if you total these numbers up and these invoices, do they match? And if you deduct 2 percent, do they match the numbers she came out with? No one's done that, and we don't know that. It's a good question, though. And if there's nothing else — Anything further? All right. Very well. Those records, Your Honor, are the commission reports published by Csikszent. Those came from Csikszent to Mechanical Marketing, and what they show is the invoice number, the dollar amount of the sale, and then it shows the 2 percent calculation of the commission. So Carol Dolgens looked at these numbers and compared those to the flow reports of dollar volume of purchases, applied a 2 percent, and came up with a commission difference, which she put in her declaration. So — Bottom line, though, correct me if I'm wrong, it seems like the declarations relied upon here came either from Mr. or Mrs. Dolgens. Is that correct? That's correct. They have taken some documents and interpreted them in a way that they believe is correct. There's no interpretation. You do not interpret a number. Even a calculation is an interpretation, right? No. Oh, it is? Okay. All right. I disagree. If I say I apply 2 percent to the number 10, I'm not interpreting something. I'm doing a mathematical calculation. There's no indication anywhere in the record that her math was incorrect, that she was somehow using some other method other than the 2 percent. We have — Let me ask you this. Do you agree at least that the judge was entitled to weigh the value of the evidence? No. Oh, okay. No. You do not — So the fact that it's the wife or it's the proponent himself that comes up with the evidence, the judge is not entitled to take that into account and weigh whether it's accurate. I've been doing this a while, and I do not know on a motion for summary judgment, whether it's State court or Federal court, that you can say that I don't believe the plaintiff when he said the light was red, and he said the light was red when I was, you know, going through the intersection in the opposite direction. I don't believe him. I believe the other person, because that's a question of fact that is left to the jury to decide. It's where you have the cases that they're citing are cases, for example, of discrimination, where you have the testimony of the plaintiff which says these events occurred, and then afterwards they try to get around their own testimony to say, no, I was discriminated against. Here we have the testimony of Arnold Dolgens, one of two parties to an oral agreement. There's nobody that even says what he says is untrue. What they're saying is it is not sufficient to a party to an oral agreement to tell you what those terms are. You have to have corroborating evidence. There is not a single case, Federal or State, that says that. And the problem that your opponent has is that the other participant to that alleged oral agreement professes no recollection of what they said during that conversation. Correct. But they do, in their counterclaim, say there was an agreement made that day, not an amended agreement. The 1998 agreement was not amended. They say we come up with a new agreement in 2005. That's what they put in their counterclaim. That's what we put in our first amended complaint. They admit that. And they say the terms are different than what you say. But that's for the jury to decide what those terms were. And, again, the records from Flo establish the amount of commissions that were unpaid on a sale which they admit were entitled to be paid a commission on. Thank you very much, Your Honor. Thank you. The case just argued is submitted and will be adjourned until 9 a.m. tomorrow morning.
judges: Tallman, Smith, Murguia